in his official capacity as President of the United States of America, et al., Mr. Janda for the Affiliate, Mr. Jacobson for the Affiliate. Mr. Janda, good morning. Good morning, Your Honor, and may it please the Court, Sean Janda for the Federal Court. Claims for Stephen N. Janda. This is an injunction that broadly requires the executive branch to make available for obligation all of the funds that Congress appropriated in 2024 for foreign assistance. That injunction misunderstands the relevant legal principles, pretermines the ability of the political branches to resolve any disagreements about how and when funds should be made available among themselves, and intrudes deeply into the executive branch's prerogatives. It should be reversed. At the outset, plaintiffs' claims fell at the threshold. As plaintiffs have now not disputed, they cannot enforce the relevant statutes governing how and when appropriated funds should be made available. And that alone dooms their claims, all of which are predicated on assertive violations of those statutes that they cannot enforce. That never was their theory, though. I think that was their theory. Their theory was that this is a constitutional question, separation of powers, and all of the APA limits on review go out the window because we're doing non-statutory equity to review a constitutional claim. I think Dalton makes clear, Your Honor, that that's just not a viable avenue to judicial review of these sorts of claims. I agree with you. But you didn't raise Dalton in the blue brief. So I think the district court's opinion, Your Honor, sort of mushes together the statutory and sort of assertive constitutional analysis. District court's opinion hurts you at this point because he was very clear, right? He broke out the APA claims and what he called the separation of powers claim. He said the separation of powers claim doesn't come with all the usual requirements of final agency review. And then he has that footnote saying you all object to constitutionalizing that claim on Dalton grounds. And he rejects Dalton as a basis for not constitutionalizing the claim. So that same footnote, Your Honor, says that the plaintiffs can enforce the relevant statutes. And so once the district court concluded the plaintiffs can enforce the relevant statutes, I don't think the district court had occasion to consider whether the plaintiffs could bring a freestanding constitutional claim in the absence of any ability to enforce the statutes. Walk me through that. I think in footnote 17, there's sort of one paragraph that says – one paragraph that talks about Dalton. Purely statutory and therefore not cognizable as constitutional claim, citing Dalton, he rejects that. And in the next paragraph – One would think that's what he should have taken issue with in the blue brief, but tell me why not. Let's say the next paragraph, Your Honor, says the plaintiffs can enforce the Empowerment Control Act restrictions, rejects the government's arguments to the contrary. And so the district court didn't have occasion to consider whether the plaintiffs could bring a constitutional claim in the absence of an ability to enforce the statutes. And I think that's the precise issue now presented for this court's review. And given the district court's antecedent conclusion about the enforceability of the statutes, the district court never had occasion to consider that claim. And really, the constitutional flavor of the district court's analysis, I think, comes not in sort of describing or thinking about plaintiff's claim, but instead in thinking about whether the defendants have sort of a constitutional defense to complying with the statutes. We haven't raised that sort of freestanding constitutional defense in this court. I think we're proceeding with this appeal on the premise that we do have to comply with the relevant statutes. But the statutory claim itself, I think, has now been sort of broken out, discarded by the plaintiffs. And in the absence of that claim, there's no freestanding constitutional claim. Even if the court, I think, was unclear about this or was unsure about this, the plaintiffs have now filed their cert replies. They've made their best arguments about Dalton. I think those arguments are presented and teed up for this court's review. And on the merits, I mean, they are doing exactly what the plaintiffs and Dalton tried to do. They are taking a claim that they can't bring as a statutory claim and claiming that it's really a constitutional claim that they can bring because of the violation of the statutes constitutes a violation of separation of powers. I think Dalton is elusively clear that you don't get to evade restrictions on review of statutory claims by constitutionalizing them in that way. Dalton dealt with a statute that granted discretion to the president. This is different. These are allegedly mandatory statutes that the president has to comply with or the executive branch has to comply with. Yes, Your Honor. I mean, there's two parts of Dalton. So the plaintiffs in that case say – the Supreme Court said in Franklin that you can't bring an APA claim against the president. And so then the plaintiffs come along in Dalton and say, well, we're not bringing an APA claim. We're bringing a constitutional claim because this violates separation of powers. And we're also bringing sort of a non-statutory equitable review claim that he's violating the statute. And the Supreme Court first says you can't constitutionalize a statutory claim in that way. And then second says even assuming you could bring some freestanding equitable statutory claims against the president, you couldn't do it. You couldn't raise sort of an abuse of discretion claim where the statute gives the president discretion. And that second part of Dalton is what's picked up in this court's decision in Chamber of Commerce, where the court is reviewing a statutory claim that the president's executive order violated the National Labor Relations Act. And this court in Chamber of Commerce sort of rejects the idea that Dalton overrules this court's precedent to allow him for non-statutory review of those claims. It's like a question of degree, does it not? Because although not all statutory claims are separation of powers claims, what the district court found in this case was that or held, really, that there was a pause in funding that was actually an intent not to spend those funds ever, and that that violates the separation of powers because Congress has the power first, et cetera. And so I do want to ask you about this because I was a little puzzled when I read your brief, and I would be grateful if you could explain to me what your argument is. Because when I read the district court's opinion, it seemed to me that on likelihood of success of the merits, he made two rulings. One was based on the Administrative Procedure Act, and the second was a separation of powers constitutional ruling based on Youngstown Sheet and Tube and the tripartite framework that that case sets out when evaluating executive power. When I read your brief, you disclaimed any desire to appeal the APA ruling, but then I didn't see any challenge to the separation of powers ruling. I don't see Youngstown even cited in your brief. So if you're not challenging the constitutional ruling, why can't we just affirm the likelihood of success ruling because you're not challenging it? So the district court's ruling on the merits of these claims or the claims about the funding pause rather than the terminations or the inability to pay for past due work, it really proceeds from the premise that the government is violating the relevant statutes. We think that's not true. Our brief explains why that's not true. If we could step back, the tripartite framework says that you evaluate executive power as it relates to congressional power. So the legislative and the executive branch are both acting here. And in the third prong of Youngstown, it says if the president is acting against the will of Congress, it's the president's or the executive branch's powers that is needed. So you have to evaluate Congress's will to apply the tripartite framework. And so the statutory analysis is in service of applying the tripartite framework. But you don't challenge the district court's application of the tripartite framework. You say, you know, I take issue with his statutory analysis. But nowhere in your brief do you take issue with the actual constitutional ruling from what I could see. I don't see Youngstown said in your brief at all. Did I just miss that? No, the constitutional analysis of the district court, to the extent there is constitutional analysis and the Youngstown analysis, it really is in service of evaluating whether there would be a constitutional defense to the need to comply with the statutes, not in service of evaluating the antecedent question about whether the statutes are being violated. And that's the antecedent question that I think all plaintiffs' claims, their issue in this appeal proceed from. But that's a different claim from a separation of powers Youngstown claim. Your claim is we comply with the statutes. Is that your claim? I mean, our argument is, number one, is that the plaintiffs don't get to enforce the statutes. And I think at this point they've conceded that. And then number two, we do believe that there is no sort of statutory mandate the plaintiffs can point to or identify that we're not complying with. Right. So your focus is on whether or not the statute has been complied with or not. And I read your brief to say we can still comply with that because we can still issue a special message. The district court has interrupted a conversation between the legislative branch and executive branch. Your focus is on the statutory issues, not on the constitutional issue in the application of Youngstown. Because we have not, Your Honor, advanced a constitutional defense to compliance with the statute. I mean, the district court's analysis, the application of the Youngstown framework is really the district court saying, you know, if the statutes require you to do this, do you have a constitutional source of authority to avoid complying with the statutes? But where is it in the district court's opinion? I just don't see that. I see a very straightforward application of Youngstown. And this is your appeal. You're supposed to tell us. What did the district court do wrong? And I don't see you saying that he was wrong in his analysis under Youngstown. I mean, that's the entire sort of relevant portion of the district court opinion. It starts from the premise that the government is violating the statutes and then evaluates whether there is some inherent article to authority to violate the statutes. And that's where it applies to the Youngstown framework because we haven't advanced that constitutional defense. I don't think the Youngstown framework is relevant to this appeal. It says you violated the statutes in the sense that you're acting against the will of Congress under prong three. I mean, that's a statutory violation. Number one, I think the plaintiffs have conceded, I think, that if we're complying with the statutes, their constitutional claim fails. We should definitely talk about that, but I'm just trying to focus on where in your blue brief are you actually challenging Judge Ali's analysis under Youngstown Sheet and Tube? We have not raised the argument in this appeal that I think he was addressing when applying the Youngstown framework, which was the constitutional defense. We have focused on the antecedent question of whether there is a statutory violation. So in your view, does this appeal turn on whether there's a statutory violation? I think it turns first on whether the plaintiffs can enforce the relevant statutes, but then second on whether there has been a statutory violation if those are statutes that the plaintiffs can enforce. So yes, like if we found that there was no statutory violation, you would win? Correct. And that's what you're asking us to find? I don't think you need to go that far because, again, I think the first thing you can find is that these claims are statutory claims that the plaintiffs don't get to constitutionalize, and Dalton makes that exceedingly clear. And they've conceded that they don't get to enforce the relevant statutes. And so I think that's all you need to say. But if you get past that, then we would ask you to say that there is no clear statutory mandate that we are violating that could support the affirmative injunction that was entered by the Supreme Court. So you actually – I know that you take issue with some of the underlying antecedents, as you say, with Judge Ali's opinion. But if we don't agree with you, you have no quarrel with his Youngstown analysis. We have not advanced in this appeal any sort of freestanding constitutional argument that the executive doesn't have to spend the funds if the statutes require the executive to spend the funds. So we have not advanced the argument. We're not asking this court to rule on that sort of constitutional defense. We have instead focused on the antecedent question of whether – If I may, I'm sorry. I just want to make sure I understand your position. Judge Ali said that the issue was the defendants are engaging in a unilateral rescission or deferral of congressionally appropriated funds in violation of Congress's spending power as expressed in multiple statutes whose constitutionality has not been questioned. And if that – that's his framing. If it's true, if the government is doing that, unilaterally rescinding and deferring congressionally appropriated funds, just assume for my hypothetical, in violation of the statute, is that a violation of separation of powers? Not in any relevant sense. I mean to the extent that any statutory violation that could be recharacterized as a violation of separation of powers, then I guess. But I think Dalton makes, again, exceedingly clear that you can't turn any statutory violation into – Not any statutory, but does that mean no possible statutory violation can ever form the basis of a separation of powers claim? I think certainly not a statutory violation like these ones. I mean Dalton gives sort of two counter – Are there any that can? Can there be a violation that, as Judge Ali frames it, you violated the statute, and you're unilaterally rescinding and deferring congressionally appropriated funds? That violates Congress's spending power. In your view, because it's statutory, it can't be a violation of separation of powers? I think what Dalton makes clear is that there are really – Can you answer my question, yes or no? Would it be a violation of separation of powers? Not in the relevant sense. I mean maybe in some abstract or academic sense. But what Dalton makes clear is that – So there can be. There can be a violation of separation of powers based on a statutory violation if the magnitude is great enough. No. What Dalton says is that's a statutory claim. Can there be, though? Can there ever be a separation of powers violation based on a statutory basis? Again, not in the relevant sense. I mean I don't know – What is the relevant sense? You keep saying that. The relevant sense is can the plaintiffs enforce the statute that they're trying to enforce, or can the plaintiffs bring a freestanding constitutional claim? So the constitutional analysis breaks down to whether the plaintiffs can enforce the statute? Let me back up. Dalton says there are sort of two freestanding types of constitutional claims. I understand your Dalton network. I'm trying to get at the big picture of what you're trying to get us to hold. And are you saying that the constitutional analysis has to break down to whether the plaintiffs can enforce the statute? No. Here's what I'm saying. And my question is how does that fit in with Youngstown? That makes no sense. Right. So here's what I'm saying. Dalton talks about Youngstown, and Dalton says there are two types of sort of freestanding constitutional claims. One arises when the plaintiff claims the statute violates the constitution. So that could give rise to a separation of powers claim. That's something like Collins or free enterprise funds where the plaintiffs say there's a statute that the government is acting pursuant to, and that violates separation of powers. The second type of constitutional claim that Dalton recognizes is a constitutional claim where the executive is relying on the constitution as an independent source of authority to act. And that's Youngstown. In Youngstown, President Truman was relying on the constitution to seize the steel mills. We have not in this appeal advanced any sort of freestanding constitutional basis to defend the actions in this case. That's important. So you are not relying on any constitutional authority based on the foreign affairs power to justify what happened in this case. You are relying only on statutory authority. Correct. And I think the constitutional backdrop, as Arif explains, is very helpful and important in understanding what Congress is trying to do in the statutes. And the fact that the executive has substantial foreign affairs power and that that power is recognized in the Foreign Assistance Act. I saw that. That's why I wanted to clarify because it's in your brief that there's foreign affairs power, but you're not relying on that to justify the actions. You're only relying on statutory authority.  And, again, I think there's no question that this is – the move that the plaintiffs are trying to make in this case is just exactly the move that the plaintiffs made in Dalton to say you're violating a statute and, therefore, it's a separation of powers violation. And so we can get around the limitations that the APA places on judicial review of statutory claims. It was rejected in Dalton, and I just don't think there's any good answer to the fact that that's exactly what the plaintiffs are trying to do here. You're walking a little bit of a fine line because you're invoking Article II. You don't want to invoke it straight out because that cinches up reviewability, but you're invoking it for avoidance purposes. I mean I think Article II over the Constitution may always be in the background when you're trying to think about a statute. But the question really breaks down to, is the president violating or is the executive branch violating a statutory mandate? And, I mean, that's just a classic statutory claim. And I think – and if you look throughout the plaintiffs' brief, the entire brief reads like a brief of statutory construction. Let me ask. Assume we agree with your initial framing that this is just a case about statutes. There's still non-statutory review inequity for judges to enforce mandatory duties. Call it Mandamus, call it Leedham v. Kine, whatever you want. Why wouldn't it still be appropriate for a court to consider an injunction compelling enforcement of an appropriation that is in the form that you must spend the following amount? I mean maybe that would be appropriate in some other case. I think it's not appropriate in this case because the plaintiffs haven't developed any argument that they can meet the exceedingly high standards that come with that sort of non-statutory review claim. I mean there's a whole framework in this court's cases that imposes very high standards on that sort of claim. And there's no discussion, certainly in the plaintiffs' brief, that says even if we can't enforce the statutes through the APA, we can meet the standards set out in this court's non-statutory review cases. Are all of the appropriations at issue in these five or six pages in the 2024 Appropriations Act? So I'm not sure, Your Honor. I mean the district court said the foreign assistance appropriations. Candidly, I'm not 100% sure exactly how far through the Appropriations Act that extends. Give me your best one that seems like a discretionary appropriation. In other words, you may spend up to X as opposed to you must spend X. So I think there's a lot of them. There's meaningful variation in them, but a lot of them do sound pretty mandatory to me. So I think that the top line point is that the sort of fact of appropriations or the lump sum appropriations that occur where they say for global health programs $4 billion or whatever is appropriated. To remain available until expended. Formulations like that sound mandatory. So I think that it may be where Your Honor is tripping up. The mere fact of appropriating in our view, I think historically, has not been understood to come with an obligation to expend the full amount. The Empowerment Control Act, I think, is doing work in the background. And when Congress enacts an appropriation. Congress can compel the executive to spend the money. Yes. And we're not taking issue with that. So then there's this question of are these appropriations mandatory or discretionary? Let me understand the short answer. Do they require spending the full amount or do they permit the executive to spend any amount up to the max? And so the historical understanding, Your Honor, is that this sort of lump sum appropriation is a cap, a ceiling. It's not a floor. What's your basis for that? And what about train versus city? So train, the basis for that, I think, is the historical analysis that we go through in our brief. And there's a lot of historical analysis in the Supreme Court's recent cases on this. The CFPB case, I think, is a helpful one. The appropriations power was historically understood as a check on unchecked spending by originally the king and then the president. Right. And so I think throughout history, that sort of top-line appropriation has never been thought to encompass an obligation to expend all the funds. The Impoundment Control Act… But there was train, and then also the whole Impoundment Control Act wasn't that passed in order to make this clear? So the Impoundment Control Act does a lot of work in the background here. But I think that the fact that the Impoundment Control Act was passed just reflects that the appropriations statutes themselves ordinarily do not include that obligation. The obligation, to the extent there is one, comes from the Impoundment Control Act, which, again, my plaintiffs have admitted they can't enforce in this court. And that act, I mean, sets up a process by which the executive and legislative branches can engage in a dialogue about whether funds should or should not be spent. That dialogue hasn't happened yet in this case. It's been pre-terminated in many ways by the district court's injunction. Can we talk about that? Because it seems to me, as I read that statute, if the president is considering deferring funds, it must send a special message. But you've already deferred the funds. You haven't sent the special message. Aren't you already in violation of the act? No. Number one, I think a deferral is sort of a tricky term of art that doesn't refer to any sort of failure to obligate the funds immediately. The statute says, whenever the president proposes to defer any budget authority, he shall transmit to the House of Representatives and the Senate a special message, including the amounts and why, etc. And then there are GAO opinions which say that a necessary prerequisite of an unauthorized holding is the special message. And agencies may only withhold budget authority from obligations if the president has transmitted a special message to Congress. So since you've already withheld the funds or not obligated them, aren't you already in violation of this? No. Before I explain why, I think at the most, if you thought that that was the violation that occurred in this case, maybe the injunction could require the executive to send a special message to comply with the statutory requirement. I don't know how you get from that violation to the district court's injunction. We're talking past each other again because I think this is just in support of the Youngstown framework. I don't think that this is a freestanding statute. I didn't understand the plaintiffs to be making a freestanding statutory claim that we want to enforce in the Empowerment and Control Act. I didn't see that in their complaint. I didn't see that in the court below. I see this as all in support of you're violating the separation of powers because you're acting against the will of Congress. As expressed in the statutes. As expressed in the statutes, but let's put that aside because we have a disagreement about that. But can you just explain how we're in compliance with the statute here? I mean, so deferrals, again, it's a term of art, and there's a lot of different reasons that funds may temporarily go unobligated. And there's a lot of back and forth historically between the executive and Congress. There may be disagreements about what their particular programmatic deferrals. And then there's policy deferrals and policy deferrals, I understand, to be bad. I mean, policy deferrals are. Do you agree with that? Like the case law says that there's lots of talk about policy deferrals. I think policy deferrals are the sorts of deferrals that. But in cases that talk about those are not allowed. Those are the deferrals that would require the sending of a special message. And in this case, I mean, the executive is in the process of, the statute where it's initially indicated, is in the process of determining what to do with these funds and is trying to decide for which ones to reprogram, which ones it may actually want to defer. While the executive is deciding that, it did a pause. It paused the funding. And why isn't it paused the deferral? Because there's a lot of things, I think, happening out in the world with these programs. There's sort of a reorganization of the relevant departments. Why is a pause not a deferral? Because there are programmatic delays that happen. This isn't a programmatic pause. This is a policy pause. They said that in the executive order. I don't read the executive order to say that, Your Honor. But again, even if you disagree about this, I mean, I think- I thought the executive order says we're reviewing these programs to see if they align with our policy priorities and our view of how we should be dealing with foreign aid. That's a policy pause. Are you not conceding that this is a policy pause? No, I'm not conceding that. Okay, you think it's a programmatic pause. I mean, I think, again, I think there are a lot of different reasons that funds go unobligated for periods of time. I mean, if the executive says, you know, we think that sort of this particular program is contrary to interest, but we're going to reprogram the funds to this other program- Regardless of why there's a pause, why is a pause not a deferral? Because a deferral requires a special message before you do it. So they're not a deferral in this case because we don't understand it to be the sort of policy-based withholding from obligation. But I think the relevant point, Your Honor- I'm sorry, deferral doesn't differentiate between policy or programmatic. The statute does not. If the executive branch wants to defer an obligation, it has to issue a special message before it does so. How is this not a deferral? That's incorrect, Your Honor. I know the statute itself doesn't draw this policy-programmatic distinction. There is a history of GAO opinions and the executive and legislative branches talking to each other- Tell me what they are. And they don't have a list. I think City of New Haven- Give me one example. I mean, City of New Haven, I think, is very helpful in this. And what City of New Haven says is that there are a million different reasons that funds might go temporarily unobligated. And most of those reasons have not been understood as requiring a special message to Congress. And again, I mean, this whole statute- Plaintiffs have conceded this point that we made in our briefs. The whole statute is about the relationship between the executive and Congress. And those are the political actors that are best positioned to determine whether any particular deferral- There's been a pause. Pause and deferral appear to be synonymous. There's been a pause. And I'm trying to understand why the statute was not violated because no special message was sent. And what I'm hearing from you is just- I'm not sure. Programmatic policy? I don't know. It's not in the statute. But why? There's been a pause. I think City of New Haven is very helpful about this. There are all sorts of reasons that funds are paused. And many of those reasons, maybe most of those reasons, have not been historically understood to require a special message. But even if you disagree with me about that, even if you think there's been a deferral- That's policy. Even if you think there's been a deferral that requires a special message, I don't see how that deferral could possibly support the district court's injunction, which doesn't require the executive to send a special message contemplated in the statute. But you will concede that if there's been a deferral and no special message, then the government's in violation of the statute. If there has been a deferral and there's not- If there's been a deferral as contemplated in the statute, not sort of the temporary unobligation, any temporary unobligation of funds, if there's been a deferral for which the statute requires a special message and no special message has been sent, then yes, there's a violation of the statute. But in this case- Okay, so final question on this. What evidence is there in the record that this is not a policy deferral? I mean, there's a lot of evidence in the record about kind of the bottom line reasons that the executive is doing this. The district court, I don't think really dug into- Could you just point me to where there's evidence that this is not a policy deferral, that it's problematic? I mean, I think the status reports that we've been filing in district court, they explain what the government is doing with these funds are helpful in this respect, which is that the government is in the process of trying to figure out which of these funds it should reprogram, how it should reprogram them. It may ultimately decide to defer or rescind some of these funds. For policy reasons. I mean, our view is that this is not a deferral. Again, there is nothing in the district court opinion-  I'm just trying to find out if you could be more specific. Where in the record is there evidence that this is a programmatic deferral and not a policy? Yeah, I mean, this is not a thing that I think- Can you be specific? Is there actually- If I could finish the answer, Your Honor. This is not a thing that we in the plaintiffs have really focused on because it's not what the district court enjoined the government to do to send the special message. And so there really hasn't been a briefing in this court, extensive briefing about what it means to defer funds within the meaning of the statute. And I think a lot of the factual development in district court has not been focused on that specific issue. I will tell you that the status reports the government has been filing and the declarations that the government has recently filed in district court make clear that the government is in the process of figuring out what to do with these funds. We don't think that this is a deferral within the meaning of the Income Control Act. But, I mean, again, number one, the plaintiffs concede that they don't get to enforce the Income Control Act. Number two, I can tell you, to the best of my knowledge, there's been no GAO opinion saying that there's been a deferral of these funds without a special message. And so Congress has an actor in this space that can reflect Congress' view about whether there's been a deferral. Can I ask you a question about this? Because your position is we could still submit a special message. The district court acted prematurely. Correct. But I think that there's a factual finding in the record that that's not what's going on. The district court has said something different. It said that, quote, defendants are acting to rescind or defer the funds Congress has appropriated and have no intent to spend them. No intent to spend them. And this factual finding is supported by evidence with statements from presidential advisor, for example, saying that it's time for USAID to die and from the president stating close it down with respect to USAID. And I don't see that you have challenged this factual finding as clearly erroneous. Are you challenging that factual finding as clearly erroneous? Because I missed that in your brief. Yeah, I mean, I'm not sure that that's really a factual finding, Your Honor. There have been statements. Why is that not a factual finding? There's a finding and then there's evidence that supports it. And that's the basis of the court's ruling. So how is this not a factual finding? Look, I think there have been statements that the district court pointed to that suggest that there is a desire within the executive branch to save some amount of this money. That's very different from a particularized determination that specific funds won't be spent. Our status reports. I'm sorry, Mr. Tana. I'm sorry. I just read it to you. There's a factual finding by the district court. He said that there's no intent to spend these funds. And that was the basis of the analysis that the court did. How is this not a factual finding that we're bound by? We're not a district court. We can't make alternative factual findings. We can't find that this process could be ongoing if the district court has said there's no intent to spend them and you haven't argued that this is clearly erroneous. I mean, the process is certainly ongoing, Your Honor. There's a ton of status reports and declarations the government has filed about what's happening with the funds. But how can we consider that when the district court made a factual finding that you're not challenging, that there's no intent to spend these funds? I mean, I take issue with that characterization of what our brief does and doesn't challenge. And I think, as we explained in our brief, there is still a lot of time for this process to play out. And the government has not made a final determination based on the record. My question is, how can we credit what you're saying when there's a contrary factual finding by the district court? We don't find facts up here. That's not our job. Because, number one, I don't think the court needs to resolve this factual issue. I mean, there's a bunch of other issues with the injunctions the plaintiffs got and with their ability to press these claims, which I can go through. But I thought this factual issue was one of the most prominent arguments that you're making, that the district court has interrupted a dialogue between the executive branch and the legislative branch. That seems to be a very important point for you. And my question is, how can we consider that when the district court made a contrary factual finding? Because we explained throughout our brief that this process is ongoing, that there's still time for this process to play out. I apologize if we didn't sort of use the words clearly erroneous. My question, how can we credit what you're saying when that's a factual representation which the district court did not credit? The district court made a contrary finding. And the district court said, I might add, that when this was, the defendants have not disputed this as their intent. This is in district court pages 31 and 32. And also footnote 13, when asked to identify anything in the record indicating any intention to spend the amount that's been sidelined, defendants counsel stated he was not familiar with somewhere in the record that there is. It was uncontested that there was no intent to spend these funds. But on appeal, you're telling me that there is. There are, again, a sort of litany of declarations that have been filed in district court. They've been updating the district court on the status of these funds. The government is in the process of trying to figure out what to do with these funds. And remember, if Congress thinks that the executive branch has made the decision to rescind these funds and hasn't transmitted the special message to Congress, the Comptroller General, a legislative official, can transmit that special message in the executive's stead. The Comptroller General hasn't done so in this case. And I think it's exceedingly odd for a third-party plaintiff to come in and ask the district court to override the executive's determination and Congress's implicit determination that there hasn't been that sort of rescission in this case to kind of kickstart what really is a dialogue between the executive and Congress. And even if you thought that there had been a decision made to rescind these funds and that there should have been a message sent, again, at the absolute most, I think that would support an injunction if the plaintiffs could enforce the Income Control Act, which they concede they can't, to send the special message to kickstart the process. I mean, nothing about that could sort of allow the district court to skip over the whole process and require the executive to make the funds available for obligation without regard to the process that's set up in the statutes for the consultation between the executive and Congress. One last question for me, which is, it seems to me this isn't so much about enforcing the Impoundment Control Act for reasons you say. That leads to an injunction to transmit the message. It's about enforcing the underlying appropriations. And the Impoundment Control Act seems to me at least relevant to that question insofar as it does seem to assume that the default rule for appropriations is that they're mandatory. You're supposed to spend all of the funds unless you go through this process to do a formal rescindment. So what do I make of that? So I think two things that may be true. Number one, I think plaintiffs have also not argued that they can enforce the appropriations statutes, which, again, don't appropriate any money to the plaintiffs specifically. There's no sort of earmarks for them. And as I said in a brief, I mean, the Impoundment Control Act and the Appropriations Act work together. And Congress has made clear that that is a process that should play out between the political branches. Help me on the substantive question. When are the appropriations mandatory and when are they discretionary? So I think that… And the ICA pushing that towards the mandatory. Yeah, I mean, I think it's really the Impoundment Control Act that creates the obligation to expend substantially all of the appropriated funds. I think everyone agrees that it's really not every penny and those sorts of disputes. For what category of appropriations? For all of them? I mean, the Impoundment Control Act, it doesn't differentiate between different appropriations. And so I think it does create that… Puzzling me. I mean, Congress could still pass an appropriation saying spend as much as you want, but no more than X. And the ICA would do nothing to limit executive discretion with regard to that kind of appropriation. Yeah, I mean, I think when you have the appropriations, they're just sort of lump sum. We're appropriating all this money. The ICA certainly makes clear that Congress expects that the executive will expend the funds or will engage in the process contemplated by the ICA. But that's not… I mean, I don't think it's an obligation that comes from the appropriation statute. And nothing in the appropriation statute, even if you thought that it or it in combination with the ICA created a mandatory obligation, nothing requires that those funds be expended sort of now or last month or two months ago in the district where I earned the injunction, rather than allowing the district or the executive and Congress to engage in this sort of interbranch dialogue. And then the other thing I'll say, I do think it's really important, is that the other way that Congress sort of creates enforceable judicial obligations is by casting statutes that actually require people to do things in the real world. I mean, usually spending money isn't an end unto itself. It's in service of some other statutory obligation. And so here, I mean, I think kind of the fundamental idea with plaintiff's claims is that they're coming in and promising their claims and the relief around the need to spend money in a vacuum rather than around the need to comply with an actual statutory mandate to do a thing in the real world. And you can imagine a suit where they say the Foreign Assistance Act requires you to do A, B, and C actual things out in the real world, and you're not doing them. And, you know, they may be able to get an injunction. I'm sure we would fight about that. But if there were these sort of mandatory statutory duties, there might be an enforceable remedy. I mean, the mandatory duty is to obligate funds in these appropriations. And I'm exploring the possibility that some of those appropriations might be discretionary. And I thought I heard you just say, no, no, no. Yeah, the ICA makes them mandatory, but it's not judicial. No, you're right. I mean, I think that there may well be discretion when you have the sort of, you know, not to exceed or not more than. That certainly comes more discretion. Our understanding is that the sort of general lump sum appropriation, because of the ICA, Congress expects that that lump sum appropriation will be substantially expended or the process will. And does what you just said cover all of the relevant appropriations at issue in this case? I mean, again, it's sort of hard to, I think, parse through. We haven't made any sort of appropriation by appropriation argument. The district court didn't go appropriation by appropriation and say, you know, these ones are mandatory. These ones are not mandatory. I think that was a good argument for you, but sounds like you're giving it up. I don't think so, Your Honor. I mean, the district court, I think, clearly framed this injunction in terms of what it thought the Impoundment Control Act requires. And our view is that the Impoundment Control Act does not require anything at this point. And it certainly doesn't require the expenditure of the funds. The Appropriations Act themselves are generally discretionary, and there's been no argument. I think that there's any sort of clear mandatory command in the Appropriations Act that require the executive to spend or to have spent the money separate and apart from the Impoundment Control Act. All right, Mr. Janda. First, Judge Katsas, do you have any more questions? No, I'm all set. Thank you. All right. Judge Pan, do you have any more questions? I do have one more question, if I may, Judge Henderson. Regarding the scope of the injunction, you argue that the injunction is too broad because it addresses appropriations from which plaintiffs don't receive funding or don't compete for funding. And appellees say that this argument's been forfeited because you didn't raise it in the district court. Can you point to any part of the record where you preserved that argument? Yes. I mean, we cite this in our reply brief. The plaintiffs in district court asked for an injunction requiring the government to restore their specific funds, and the government made the argument that any injunction along those lines would have to be limited to the plaintiff's specific funds. The district court sort of crafted an injunction of its own making that sort of went beyond the funds that the plaintiffs competed for. It went beyond or sort of stopped short of requiring the government to restore the plaintiffs' contracts. From my reading of the transcript, it seemed that that plaintiff-by-plaintiff type discussion was about the APA claim. But on the separation of powers claim, the court asked counsel for the government, would the right scope of relief be spent but not spent on plaintiffs, meaning a broader one, not just tailored to the plaintiffs? And government counsel said yes, for certain. So it sounds like there was a concession in the district court that the scope of relief for the separation of powers claim should be broadened. No, Your Honor, that's incorrect. The plaintiffs asked for an injunction requiring the government to spend the money on them. The government argued successfully in district court, and I think correctly, that at the absolute most, the statutes would require the government to spend the money on these programs generally, not on the plaintiffs specifically. But the district court didn't address – the briefing district court really didn't address the separate issue, because the plaintiffs didn't ask for this injunction, about whether an appropriate injunction could also cover appropriations for which the plaintiffs haven't made any showing or determination that they could compete for those appropriations. And I think that sort of basic Article III and equitable principles that we cite in our brief that were reaffirmed by the Supreme Court just recently make clear that that's an overbroad injunction that cannot stand. Because I think this is kind of important, this is on page 128 of the transcript. Maybe you could, when you come back on rebuttal, address this a little bit more thoroughly, having looked at the transcript. Sure. Thank you. All right, we'll hear from Mr. Jacobson. Good morning, Your Honors. May I please declare Daniel Jacobson for the appellees. I'd like to begin with Dalton, Your Honor, and why the government's belated Dalton defense does not foreclose our separation of powers claims in this case. First, and I won't dwell on the point, but as Your Honor's point noted out, this argument was clearly forfeited by the government. The district court's holding could not have been more clear that it was a separation of powers holding. And in reaching that holding, the district court rejected their Dalton argument. And yet, as Your Honor noted, it was absolutely nowhere to be found in their opening brief. But putting forfeiture aside, Dalton doesn't include our claims here for two reasons. First, because this case falls under the paradigm of Youngstown and specifically the basis on which Dalton distinguished Youngstown. And second, because this court's decisions in Aiken and Chamber of Commerce v. Reich are irreconcilable with their theory of Dalton. I'll start with Youngstown. The government said in its reply brief, and reaffirmed here today, this is on page five, their reply brief, they said that their Dalton argument wouldn't apply where, quote, executive officers rely on the Constitution as an independent source of authority to act. That is exactly what we have here, Your Honor. The relevant question is not the arguments that counsel chose to raise on appeal. The relevant question is what do the relevant executive officials here rely upon when they took this action? And here it was only the Constitution. The president's executive order invoked his constitutional authorities and proclaimed, quote, no further United States foreign assistance shall be dispersed in a manner that is not fully aligned with the foreign policy of the United States. Blanket. No more money goes out unless it's aligned with my policies pursuant to the president's constitutional authority. Then in the district court proceedings below, Pete Morocco, who at the time was the acting head of USAID, on February 18th, he submitted a declaration, and this is at UCF 25-1 in the Global Health Council case. He submitted a declaration that said, quote, on January 20th, President Trump exercised his constitutional authority to conduct foreign policy, to issue an executive order directing a pause and so on. So this is defendants themselves saying that the president and they were relying on the president's constitutional authority to refuse to spend this money that Congress directed be spent. That is exactly the situation in Yellowtown. Fair point, but they're not defending the executive action here on that basis. Well, Your Honor, what the argument... Putting aside avoidance, which is a ring. Right, Your Honor. The main thrust of their argument is all about the statutes. So several points on that, Your Honor. One is that was not their defense below at all. Not a single time below, they did not raise the statutory argument regarding how to construe appropriation statutes at all. Their only defense below on the substance of the separation of powers claim was based on the president's supposedly vast and unreviewable foreign affairs powers under the Constitution. Below, Your Honor, it was not a constitutional avoidance argument. It was a straight up, you cannot order us to spend these monies based on the president's constitutional foreign affairs power. That was it. And the other argument they made was based on Dalton. But nowhere in their briefs did they say actually these appropriations laws don't require us to spend all the money. That is presented on appeal for the first time. It is clearly waived, not having raised it below. And waiver aside, if you think of it almost like an APA case, well, this is not an APA claim. This is a post hoc justification that the government has come up with on appeal. And that's not the relevant inquiry. As they themselves said in their brief, again, the question is whether the executive officials relied on their constitutional authority. And that's exactly what we have here, Your Honor. And it is, I'll note that it really is quite striking how similar this case is to Youngstown. In Youngstown, the Youngstown majority said, quote, the president's order does not direct that a congressional policy be executed in a manner prescribed by Congress. It directs that a presidential policy be executed in a manner prescribed by the president. That sentence fits this case to a T. That is what the language of the executive order that I just read does. It says no money shall be spent, even though Congress required it to be spent, unless it complies, comports fully in line with the words, with my policies as the president. So, Your Honor, you know, this is not a case we submit where you need to sort of get into this question, which I get is a very big question of how broadly Dalton does or does not apply when we're dealing with statutory mandates. How clear does the mandate need to be? A statutory mandate, you know, by itself, give rise to a constitutional claims. Our claim here is that the president's reliance on his constitutional authority to not comply with these mandates was invalid, and therefore it violates the separation of powers. What's the difference in your view? What turns on whether we think of this as a constitutional claim under separation of powers or a statutory claim? In non statutory review, lead them versus kind mandamus.  Either way, it seems like where the rubber meets the road is on whether we think the relevant appropriations and or the impoundment control act create some clear mandatory duty. In part, I would say, Your Honor, and just if I may, very briefly, counsel for the government said a number of times that we concede or we admit that we can't enforce the relevant statutes. There's been no such concession or admission. The district court ruled on the separation of powers basis, and we're defending that ruling. But if you're not making that concession, the threshold question of whether this is in the constitutional bucket or the statutory bucket seems much less significant. I think you're absolutely correct, Your Honor, that as Judge Pan pointed out, as part of the Youngstown analysis, the question of whether the expressed will of Congress here is to spend the money is relevant, certainly to both the constitutional and the statutory piece. I think the big difference here, as I was mentioning a moment ago, is that the constitutional analysis also has to address the president's invocation of his constitutional power to not comply with those mandates. And that's really, in our view, what distinguishes the two types of claims. All right, so suppose we reject that. Give me your position. Sure, Your Honor. I would point to... Are you enforcing the appropriations statutes or the Impoundment Control Act? Yeah, absolutely, Your Honor. As Your Honor was saying, we fully agree the relevant mandate here is the Appropriations Act. It is not the Impoundment Control Act. The relevant appropriation is that in 2024, Congress appropriated very specific pots of money for foreign assistance purposes, and it required the executive branch to spend the full amount of money. And you agree Congress could pass an appropriation that is discretionary, in the sense of spend as much as you want, but no more than that. Absolutely, Your Honor. We noted in our briefs and many, many historical examples of this, including within this very same 2024 Appropriations Act, including within some of the USAID provisions, they say X amount of money... So once you just clear aside all of this underbrush, we're talking about whether the relevant appropriations here are mandatory or discretionary. That is absolutely a predicate to any of our claims. Okay. So how do we know... I mean, both sides here are litigating this case kind of blissfully free of any statute-by-statute analysis of the text of the governing appropriations. And I think a lot of them look pretty good for you, but how can we decide that globally? No one is giving us to the text of specific appropriations. I'm happy to answer that, Your Honor. The relevant appropriations here are found in Title III and Title IV of what's known as the SFOPS, the State and Foreign Operations Bill. So I have the Further Consolidated Appropriations Act 2024... Correct, Your Honor. 740 through 746. Is that the universe? Just give me one moment to confirm, Your Honor. Yeah, Title III. No, it's Title III, but it's also Title IV, which goes through page 750. That's the relevant... Those are the relevant buckets. And the way this was structured is that each of those buckets appropriates a specific amount of money for that broad purpose, such as global health programs, economic development. And you know those are mandatory because Congress did not use its discretionary language that it uses when it wants it to be discretionary. Not a single one of those says, you know, up to or no more than. No, but there is meaningful variation. Among the various statutes, and some sound a lot more mandatory than others. So, like, shall be apportioned or to remain available until expended, to me, sound a lot more likely to be mandatory than another one says to remain available. So, Your Honor, the key language is the for, and then it gives a purpose, and then it gives a plop of money. That by itself makes it you have to spend that full amount of money because it doesn't say up to or no more than. Because that's what Congress does when it wants to give discretion. And they all say to remain available until some point. Some say until 2025. But in addition, Your Honor, here, as we noted in our 28-J letter, in some ways this case is far simpler because there are a ton of shalls here. In section 7019 of this Appropriations Act, and then in sections 7030 and 737061, Congress prescribed subcategories out of these categories. And it said X amount of money shall be made available in a specific amount for the specific purpose. So, in 7019A, what it says is, and I can just pull this up. I'll check that. That's all in your 28-J. It's in our 28-J. It says, funds appropriated under Title III through Title V shall be made available in the amount specifically designated in certain tables that are then appended to the report. Then B says that they can deviate only by 10% up or down from those amounts, and they can't deviate at all for global health programs. And then later on, separate from the tables, section 7030 through 7061 say not less than X amount of money shall be made available for a particular purpose. I will tell Your Honors that those shalls comprise the vast, vast majority of the total $30 billion in foreign assistance funds. It doesn't make up all of them, so it doesn't smooth the question. I mean, there's the rub, right? I'm sorry, Your Honor? There's the rub, which is you might have been able to go through these appropriations provision by provision and strung together a bunch of mandamus claims that this one is mandatory and this one is, I don't know, ambiguous, but in light of the Impoundment Control Act, we'll treat it as mandatory. But Your Honor, I wouldn't do it. Your Honor, the appropriation itself, just going back to Title III, in the world of congressional appropriations, this is how Congress says it's mandatory. It would absolutely be earth-shattering to congressional appropriations if the court said, actually, the way Congress appropriates every single bucket of funds across the entire federal agency, actually, there needs to be a shall. And if there's not a shall, it's not mandatory. That has never, ever, at least for the last 50 years since the Impoundment Control Act was enacted, been the understanding. It would completely disrupt settled expectations of progress in the executive branch for trillions of dollars in appropriations that are outstanding. And you get that from the ICA. We're in an era where we pay a lot of attention to text and shalls are different from mays. So it's two places, Your Honor. It's the fact that they use up to or no more than when they want it to be discretionary under the defendant. Yeah, but that's almost approaching a magic words requirement. I don't think so, Your Honor. If their position was right that this amount, this top-line amount was a ceiling, then all of the hundreds of uses of up to and no more than are not exceeding. Those would all be completely surplusage. They would serve no function at all because it would already be the case that these top-line amounts provide a ceiling and not a floor. So it simply can't be read that way. I mean, but on your reading, the express shall spend is surplusage as well. I mean, some are clear one way. Some are clear the other. And I will say and litigate about the ambiguous ones. There's also the Impoundment Control Act and the text of the act, which, as GAO has said many times, the text of the act builds into it. The premise that appropriations must be spent in full unless the president submits and Congress passes a rescission proposal. There's no way to essentially speaks clearly to make it correct. Your Honor, there's no sensible way to read the text of the Impoundment Control Act, which says that if the president determines that for policy reasons, he doesn't want to spend the funds or sorry. If the president determines that funds should be rescinded, he must submit a proposal to Congress. If there was no baseline requirement from the appropriations statute to spend the funds, then why would the president ever need to determine that they quote should be rescinded? It would make no sense. The president could just let the funds expire, die in the vine. The only way to make sense of that statute is that you have to spend the funds unless there's express discretion conferred within the statute. And Congress legislates every new Appropriations Act, knowing that baseline premise that's built into the Impoundment Control Act. And that's why they use those magic words up to or no more than where they want to give that discretion, Your Honor. I'm sorry, just how does the ICA relate to the Appropriations Act if it's discretionary? Is it not applicable? It's not applicable, Your Honor, unless there's some minimum amount, which is rarely the case where you say you must spend at least up to. But that's not the case with any of these here. That's exactly right, Your Honor. Your Honor, I'd like to focus on the scope of relief question, if I may. Just before you get to that back end, can I ask about the front end of the case, which is standing?  Most of this case was about obligations under existing contracts and grants and cooperative agreements. Where did you make the case for standing to compete for future grants? Your Honor, that was expressly made at the preliminary injunction hearing on this case. I don't have a pin site handy. I can certainly find it and submit it, but the district court. The complete, I mean, the only standing affidavits that I saw were filed in connection with the TRO motion, right? There were supplemental ones about enforcement, but yes, Your Honor. And the district court, I think quite rightly at the TRO hearing, said plaintiffs don't assert a harm based on expectation of receiving future grants. They assert harm in existing contracts with the respective agencies. I was talking about irreparable injury, but no one distinguished the injury for irreparable injury purposes from the injury for standing purposes. I think that's right. So if this characterization is right, what's your standing to seek prospective relief for future grants? So I would point, Your Honor, to the declarations which are in the JAA, those same declarations. Those declarations describe how for many of these plaintiffs, USAID money in particular comprises anywhere between 80 and 98 percent of their annual revenues. And so obviously, if none of that money is made available for competition, the irreparable harm will be existential to those companies because it's their entire base of business. For Democracy International, and I can find, Your Honor, the exact site, it's at JAA 344. They described that 98 percent. It's just an inference from the pervasiveness of the funding. And the number of awards that they held historically, Your Honor. CommonX and DEI, who are the two largest for-profit recipients of foreign assistance funds in the country, they each in their declarations, they explain that at the time of these injunctions, they had 100 different awards, each in over 100 different companies. And in these countries, they earned billions of dollars in revenues a year. That base of business is all now gone. And under this Court's cases, things like Coalition of Miso Transmitters and the Teton case, the Court has clearly held that in a lost opportunity to compete, it's cognizable injury that's addressable by making funds available. And with respect to the scope of that, on pages 59 to 61 of your brief, you argue that collectively, plaintiffs and their members are in a position to compete for funding under a whole bunch of different appropriate provisions. There's a big list there. My question was, is that list intended to be comprehensive? Not at all, Your Honor. I can point, Your Honor, to the declarations and also just represent, Your Honor, the scope of work that our clients compete for. But it's not for all appropriations because the injunction says, you know, obligate all the funds. And you're not trying to say that you compete for all of the funds. Your Honor, what I would say is that our clients, collectively, we've done this exercise since the Casa case, and I'm happy to talk more about this in the scope of relief. If you take all of the different, not just larger categories, but the specific subcategories that are laid out in the Appropriations Act, our clients, collectively, would compete for, I believe, 99% of the funds that comprise. They truly run the waterfront, Your Honor. SBIC, this is at CAA 252, it's a membership organization that is comprised of 170 members, and this is all they do is foreign aid work. And they work in all sectors and geography, including economic growth, agriculture and food security, democracy and government, water and sanitation, global health, education. There's more, but I won't read the whole list, Your Honor. But if your clients collectively competed for, let's say, 10%, this would be an overbroad injunction. I think in light of the Casa case, Your Honor. You're asking for a de minimis exception to Casa scope principles. Your Honor, I would say several things with respect to scope and Casa. One is we do think that the record establishes that the scope of relief is warranted, but if Your Honors have any question about that, one option would be to take the very approach that Casa took itself, where the court, you know, they said that they were staying the injunction, but only to the extent it was broader than necessary to provide complete relief to the plaintiffs. And so one option that's on the table for this court is to affirm, but only to the extent the injunction was, you know, no broader than necessary to provide complete relief to the plaintiffs, and then give the district court a very short amount of time to receive, you know. The district court would work that out. Correct, Your Honor. And we think that, you know, would be a sensible approach, and it is in line exactly with what the Supreme Court just did in Casa. Because this list and this 99% figure you gave us was not before the district court, so it should go to the district court first, correct? That's correct, Your Honor. All right, if there are no more questions, thank you, Mr. Jacobson. Mr. Janda, I think you had a question that Judge Pan wanted you to answer. So answer that and take another two minutes. Thank you, Your Honor. So starting with the question, I think it's sort of as I said before, the relevant discussion at the district court hearing was focused on the question whether the injunction should direct the money be sent to the plaintiffs or should instead direct at most that the money be spent sort of within the program generally rather than on the plaintiffs. As to that question, the government's position is, and the district court agreed, that nothing in the statute requires the money be given to the plaintiffs. And so any injunction with force has to be limited to enforcing whatever statutory obligation the district court or this court found. The district court was careful not to do that. Right, right. The district court, I think, did that correctly. But on the question of whether the government forfeited the argument that an injunction running to every appropriation itself was overbroad, my point is that the plaintiffs didn't seek that injunction. I said this before. The plaintiffs didn't seek that injunction in their PI brief. The government's PI opposition focused on the need to limit relief to the plaintiffs. And then when this issue came up at the hearing, I think the government was focused on the separate question of money to the plaintiffs or money generally. But I think it's now conceded that really it has to be limited to both as a matter of equity and as a matter of Article 3, the actual money that the plaintiffs could compete for. I think the plaintiffs don't contend that it's everything. I don't know exactly how much it is. I think after they filed their red brief, the actual pots of money sort of multiplied with the 28-J letter. And so I'm not sure that they have even said they could show all or most of those individual pots of money that they think the government's obligated to spend funds on. Do you think for the funds for which they could compete, do you think they have adequately pleaded standing? So we have not raised a standing argument on the legal—we agree with the legal principle, or we don't contest this court's cases establishing the legal principle, that the opportunity to compete for funds is itself an injury. We haven't had the opportunity to go, I think, sort of line item by line item to see which ones the plaintiffs fall into. And I think that just mirrors a bigger problem with the district court's injunction, which is that the plaintiff's claims for relief and all of the analysis in the district court's opinion and below was focused on the need to spend all of the money, which I think is a need that the district court located and the plaintiffs have located in the Empowerment Control Act. There's no appropriation by appropriation analysis. There's no sort of program by program analysis with reference to the Foreign Assistance Act. It's just this broad brush. You have to spend all of the money, and that, I think— If we think there's a scope issue that turns roughly on programs for which they could compete and programs for which they couldn't, do you have any suggestion? Do you agree with your colleague's suggestion for how we would handle that? No, I think at that point— Can I flag that point and remand for the district court to figure out whether it's 99 percent or 50 percent or whatever? I mean, I think at that point, the district court has their own injunction that goes beyond the Article III inequitable powers of the district court. The injunction should be vacated, and if the plaintiffs want to try again with reference to particular funds that they think they could compete for, I think they could do that. I would say I think there would be a real problem if the court in a month popped out because the funds are expiring. I think the government and the plaintiffs need to know pretty soon whether the government has to obligate all of those funds, some of those funds. None of those funds, if it goes through the procedures laid out in the Empowerment Control Act. And so just the one other thing I would say is I think it became very clear in the plaintiffs' argument that they are locating the relevant obligations really in the Empowerment Control Act. And they can see it. They don't get to enforce the Empowerment Control Act. I think all the court needs to say is those two things, and that resolves the case. What are the practical deadlines? Like all the funds, the budget authority expires September 30. What has to happen on the ground for this to work if they're going to get some measure of relief? Yeah, so some of the funds expire September 30. There are other funds that expire in later years. They're covered by the injunction. Our understanding and my understanding from the agencies is that August 15 is really the day when they need to start the process of going through the process of making these obligations irretrievably to get the funds out the door by September 30. And so that's sort of the deadline. So I'll be asking this court for an opinion by that date. With that, we ask that the court vacate the injunction. All right, counsel. Thank you.
judges: Henderson; Katsas; Pan